**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| RICK SEBENOLER derivatively on behalf of RESOURCE CAPITAL CORP., | : | Civil Action No. |
| Plaintiff, | : | |
| v. | : | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES AND UNJUST ENRICHMENT** |
| WALTER T. BEACH, EDWARD E. COHEN, JONATHAN Z. COHEN, RICHARD L. FORE, WILLIAM B. HART, GARY ICKOWICZ, STEVEN J. KESSLER, MURRAY S. LEVIN, P. SHERRILL NEFF, STEPHANIE H. WIGGINS, DAVID E. BLOOM, DAVID J. BRYANT, and ELDRON C. BLACKWELL, | : | **JURY TRIAL DEMANDED** |
| Defendants, | : | |
| and | : | |
| RESOURCE CAPITAL CORP., | : | |
| Nominal Defendant. | : | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Rick Sebenoler ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Resource Capital Corp. ("Resource Capital" or the "Company"), against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment, from at least 2012 through the present (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which included, among other things, review and analysis of: a) public filings made by Resource Capital and

other related parties and non-parties with the Securities and Exchange Commission ("SEC");

b) press releases and other publications disseminated by certain of the defendants and other related non-parties; c) news articles, shareholder communications, and postings on Resource Capital's website concerning the Company's public statements; d) pleadings, papers, and any documents filed with and publicly available from a related securities fraud class action in the Southern District of New York, captioned *In re Resource Capital Corp. Securities Litigation*, 1:15-cv-07081-LLS (the "Securities Action"), which action survived a motion to dismiss late last year;[1] and e) other publicly available information concerning Resource Capital and the defendants. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     Plaintiff, on behalf of nominal defendant Resource Capital, contends that the Individual Defendants (defined herein) caused the Company to: (i) mislead the market regarding the risks associated with commercial property in Puerto Rico, and (ii) release materially false and misleading earnings reports and other public filings throughout 2016 by failing to account for a significant credit impairment and improperly emphasizing adjusted funds from operations ("AFFO").  Eventually, the Individual Defendants caused the Company to announce the need to

---

[1]     As a result of the events described herein, Resource Capital became the subject of the sustained Securities Action.  The "Class Period" has been defined in the Securities Action as October 31, 2012 through August 5, 2015, and Jonathan Z Cohen ("J. Cohen"), David J. Bryant ("Bryant"), Eldron C. Blackwell ("Blackwell"), and David E. Bloom ("Bloom") are named as individual defendants.  On February 12, 2016, the plaintiff in the Securities Action filed an Amended Complaint for Violations of the Federal Securities Laws (the "Securities Complaint"). On October 5, 2016, U.S. District Judge Louis L. Stanton ("Judge Stanton") denied the defendants' motion to dismiss the Securities Action in its entirety, notwithstanding the heightened pleading standards imposed upon the plaintiff in the Securities Action by the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Judge Stanton concluded that the plaintiff had sufficiently alleged a violation of § 10(b) of the Exchange Act.

recognize an allowance of loan loss of $41.1 million to protect it from exposure from the Puerto Rican economy, and admit that the AFFO metric failed to provide a true and accurate representation of the Company's finances.  As a result, the Company has been, and will continue to be, exposed to unnecessary litigation and enormous financial and reputational harm.

2.      According to its public filings, Resource Capital, together with its subsidiaries, originates, purchases, and manages a diversified portfolio of commercial real estate, commercial real estate-related assets, and, to a lesser extent, residential real estate and commercial finance assets.  The Company is organized as a Real Estate Investment Trust ("REIT").

3.      The commercial real estate-related investments held by Resource Capital include mezzanine loans, which in 2014, constituted approximately 5% of the Company's loan portfolio.

4.      Investing in commercial real estate mezzanine loans, according to the Individual Defendants, is "subject to the risks inherent in the real estate securing or underlying those investments[.]"  More specifically, "[t]he ability of the borrower to repay a loan secured by or dependent upon an income-producing property typically depends primarily upon the successful operation of the property….  If the net operating income of the property is reduced, the borrower's ability to repay the loan may be impaired."

5.      In 2007, certain of the Individual Defendants caused the Company to invest in a mezzanine loan backed by a portfolio of 13 luxury hotels (the "Mezzanine Loan") owned by Blackstone. The portfolio backed $742.5 million of debt securitized through the Wachovia Bank Commercial Mortgage Trust, 2007-WHALE8 (the "2007-Whale8 Trust"), which over time was downgraded by ratings agencies, with Moody's, for example, citing "loan performance not meeting…expectations."

6.     By 2012, Blackstone failed to meet its payment obligations to its specialty servicer, leading it to enter into a forbearance agreement that required the sale of each of the hotels before March 24, 2014, and then the refinance of the remaining debt before maturity on September 9, 2014 (the "Forbearance Agreement").

7.     By 2014, Blackstone had sold all but four of the luxury hotels in the portfolio.  Of these, three were located in Puerto Rico—the El San Juan Hotel & Casino in Puerto Rico, the El Conquistador Golf Resort and Casino in Fajardo, and the Condado Plaza Hotel & Casino in San Juan.

8.     Importantly, Puerto Rico's economy had been mired in a recession, its residential real estate market had been seriously damaged, and its banking sector had come under serious stress, causing the county to incur enormous public debt.  Rather than acknowledge Puerto Rico's declining economy and its credit rating, which was downgraded by all three credit rating agencies to "junk" status, the Individual Defendants caused Resource Capital to conceal the risks that it had become subjected to by way of its investment in the Mezzanine Loan, opting instated to portray its mezzanine loan portfolio as being particularly strong.

9.     This occurred for years.  Indeed, starting at least in 2012, the Individual Defendants caused the Company to host a series of analyst conference calls and file numerous quarterly and year-end financial reports with the SEC assuring the market that Resource Capital's real estate loans were performing well.

10.     By 2015, the Individual Defendants could no longer conceal the truth about the Puerto Rican economy and its negative impact on Resource Capital's financial health. On August 4, 2015, the Individual Defendants caused the Company to issue a press release announcing its financial results for the quarter ended June 30, 2015.  Therein, and for the first time, the

Individual Defendants caused the Company to disclose its exposure to the Puerto Rican economy, as well as the true credit risk profile of Resource Capital's mezzanine loan portfolio. Specifically, it was revealed that Resource Capital reported an allowance for loan loss on mezzanine loan position of $41 million in total, which contributed, if not was the cause of, a Generally Accepted Accounting Principle ("GAAP") net loss of $31.0 million. That the Individual Defendants revealed "the last three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that the loan should be fully reserved," speaks volumes.

11. Even more remarkable, the Individual Defendants concealed from the market for years that the Mezzanine Loan provided essentially no benefit to the Company. Defendant Bloom revealed the truth on the Company's second quarter 2015 earnings conference call held on August 5, 2015. He informed participants that the Mezzanine Loan was "restructured and amended in 2012 and since that time, interest was on an accrual basis, so it has not contributed to our income since September of 2012 in any meaningful way." This stood in stark contrast to the multiple years' worth of public disclosures made by the Company under the Individual Defendants' control and on their watch, during the Relevant Period.

12. The Individual Defendants' misconduct as alleged herein, subjected the Company to the Securities Action and the Securities Complaint, which has since been sustained following the defendants' motion to dismiss. Judge Stanton found that the plaintiff in the Securities Action adequately alleged that: Resource Capital's describing the Mezzanine Loan as "performing" or "current" without stating the qualification that it was a non-interest-paying troubled debt of a borrower in financial difficulty was "…to omit to state a material fact necessary in order to make

5

the statements made, in light of the circumstances under which they were made, not misleading…" As a result, the plaintiff in the Securities Action "...plead[] a prima facie violation of §10(b) of the Exchange Act, 15 U.S.C. §78j(b)."

13. Accordingly, the Individual Defendants' misconduct as set forth herein, has caused the Company and to be damaged, giving rise to Plaintiff's reasonable suspicion that one or more Company fiduciaries breached their duties owed to the Company and/or engaged in other violations of law.

14. In light of the events described herein and in accordance with Maryland law, on January 31, 2017, Plaintiff sent a written litigation demand (the "Demand") to Andrew L. Farkas ("Farkas"), Resource Capital's Chairman, demanding that the Board investigate and take legal action against those responsible for the damages the Company has suffered and is certain to suffer. A true and correct copy of the Demand is attached hereto as Exhibit A.

15. Less than two months later, Plaintiff's counsel received a letter (the "Refusal") from Joshua Horn ("Horn") of Fox Rothschild LLP ("Fox Rothschild") dated March 22, 2017, acknowledging receipt of the Demand and enclosing a response from the Company refusing a demand filed by another shareholder in a related derivative action. A true and correct copy of the Refusal is attached hereto as Exhibit B.

16. The Refusal is notable in that Horn admits that the Board did not and has not considered the Demand, opting instead to enclose a report generated by a Demand Evaluation Committee ("DEC"), which was appointed to examine the claims of other shareholders, whose demands are purportedly "nearly identical" to that made by Plaintiff (the "DEC Report"). Further proving that Plaintiff's demand was not seriously considered, Horn notes that "to the extent" that the Demand "has made allegations, distinct from those addressed in the enclosed, the

Demand Evaluation Committee will continue its review of this matter and I will follow-up with you accordingly."

17. The Refusal, to the extent that it addresses claims made in the Demand, is improper and demonstrates the Board's lack of good faith and abject failure to consider the allegations in the Demand. Therefore, Plaintiff should be allowed to proceed and to prosecute this action derivatively on behalf of the Company.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

19. This Court has personal jurisdiction over each of the Defendants because each is either a corporation conducting business and maintaining operations in this District, or is an individual who is either present in this District for jurisdictional purposes, or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20. Venue is proper in this district pursuant to 28 U.S.C.§ 1391 because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this district. Moreover, one or more of the Defendants either reside in or maintains executive offices in this district, and Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

21. Plaintiff is a current shareholder of Resource Capital and has continuously held Resource Capital stock since 2008. Plaintiff is a citizen of Texas.

22. Nominal party Resource Capital is a Maryland corporation that maintains its principle executive offices at 712 5th Avenue, 12th Floor, New York, NY 10019. Resource Capital's common stock trades on the New York Stock Exchange under the ticker symbol "RSO."

23. Defendant Walter T. Beach ("Beach") has served as a director of the Company since March 2005. Defendant Beach is a member of the Audit Committee. Upon information and belief, Defendant Beach is a citizen of Pennsylvania.

24. Defendant Edward E. Cohen ("E. Cohen") has served as a director of the Company since March 2005 and was Resource Capital's Chairman from March 2005 to November 2009. Defendant E. Cohen also serves as Chairman of Resource America, the corporate parent of the Company's Manager (defined below), a position he has held since 1990. He also served as Resource America's CEO from 1988 to 2004 and as its President from 2000 to 2003. Upon information and belief, Defendant E. Cohen is a citizen of Florida.

25. Defendant Jonathan Z. Cohen ("J. Cohen") has served as CEO, President and a director of the Company since March 2005. Defendant J. Cohen has been President since 2003, CEO since 2004, and a director since 2002 of Resource America. Upon information and belief, Defendant J. Cohen is a citizen of Pennsylvania.

26. Defendant Richard L. Fore ("Fore") has served as a director of the Company since March 2013. Defendant Fore informed the Board on March 2, 2017 that he does not intend to stand for re-election as a member of the Board at the Company's next annual meeting of stockholders, which is expected to be held on June 1, 2017. Upon information and belief, Defendant Fore is a citizen of Nevada.

27.     Defendant William B. Hart ("Hart") has served as a director of the Company since March 2005.  Defendant Hart is a member of the Audit Committee.   Upon information and belief, Defendant Hart is a citizen of Virginia.

28.     Defendant Gary Ickowicz ("Ickowicz") has served as a director of the Company since February 2007.  Upon information and belief, Defendant Ickowicz is a citizen of New Jersey.

29.     Defendant Steven J. Kessler ("Kessler") has served as the Company's Chairman since November 2009 and was the Company's Senior Vice President – Finance from September 2005 to November 2009 and, before that, served as Resource Capital's Chief Financial Officer ("CFO"), Chief Accounting Officer and Treasurer from March 2005 to September 2005. Defendant Kessler has been Executive Vice President of Resource America since 2005 and was CFO from 1997 to December 2009 and Senior Vice President from 1997 to 2005.  Upon information and belief, Defendant Kessler is a citizen of Pennsylvania.

30.     Defendant Murray S. Levin ("Levin") has served as a director of the Company since March 2005.  Upon information and belief, Defendant Levin is a citizen of Pennsylvania.

31.     Defendant P. Sherrill Neff ("Neff") has served as a director of the Company since March 2005.  Defendant Neff is Chairman of the Audit Committee.   Upon information and belief, Defendant Neff is a citizen of Pennsylvania.

32.     Defendant Stephanie H. Wiggins ("Wiggins") has served as a director of the Company since June 2013.  Defendant Wiggins serves on the Audit Committee.  Upon information and belief, Defendant Wiggins is a citizen of Virginia.

33.     Defendant David E. Bloom ("Bloom") has served as the Company's Senior Vice President – Real Estate Investments since March 2005.  Defendant Bloom has been Senior Vice

President of Resource America since 2001.  Upon information and belief, Defendant Bloom is a citizen of New Jersey.

34.    Defendant David J. Bryant ("Bryant") has served as the Company's Senior Vice President, CFO and Treasurer since June 2006, and was Resource Capital's Chief Accounting Officer from 2006 to 2014.  Upon information and belief, Defendant Bryant is a citizen of Pennsylvania.

35.    Defendant Eldron C. Blackwell ("Blackwell") has served as the Company's Vice President and Chief Accounting Officer since March 2014. Upon information and belief, Defendant Blackwell is a citizen of Pennsylvania.

36.    Collectively, Defendants Beach, E. Cohen, J. Cohen, Fore, Hart, Ickowicz, Kessler, Levin, Neff, Wiggins, Bloom, Bryant, and Blackwell are referred to herein as the "Individual Defendants."

37.    Collectively, Defendants Beach, J. Cohen, Fore, Hart, Ickowicz, Kessler, Levin, Neff, and Wiggins, are referred to herein as the "Director Defendants."

38.    Collectively, Defendants Neff, Beach, Hart, and Wiggins are referred to herein as the "Audit Committee Defendants."

## THE INDIVIDUAL DEFENDANTS' DUTIES

39.    By reason of their positions as officers, directors, and/or fiduciaries of Resource Capital, and because of their ability to control the business and corporate affairs of Resource Capital, the Individual Defendants owed Resource Capital and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Resource Capital in a fair, just, honest, and equitable manner.

40.    Further, the Individual Defendants were and are required to act in furtherance of the best interests of Resource Capital and its shareholders so as to benefit all shareholders

equally, and not in furtherance of their personal interest and benefit.  Each director and officer of the Company owes to Resource Capital and its shareholders the fiduciary duty to exercise good faith and due diligence in the administration of the affairs of the Company, and in the use and preservation of its property and assets, as well as the highest obligation of fair dealing.

41.    Because of their positions of control and authority as directors and/or officers of Resource Capital, having knowledge of material non-public information regarding the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  To discharge their duties, the officers and directors of Resource Capital were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties the officers and directors of Resource Capital were required to, among other things:

a.    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.    Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

c.    Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results; and

d.    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

42.    Pursuant to the Audit Committee's Charter, all members of the Audit Committee were to assist the Board in fulfilling its oversight duties and in this capacity, "shall monitor the

11

integrity and ensure the transparency of the Company's financial reporting processes and systems of internal controls regarding finance, accounting and regulatory compliance." Specifically, the Audit Committee was, and remains, responsible for:

> Review[ing] significant accounting and reporting issues and understand[ing] their impact on the financial statements.  These include:
>
> - Complex or unusual transactions and highly judgmental areas
> - Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles
> - The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company
>
> *        *        *
>
> Discuss[ing] the annual audited financial statements and quarterly financial statements with management and the external auditors prior to filing or distribution.  The review should include discussions with management and independent auditors of significant issues regarding accounting principles, practices and judgements.
>
> Review[ing] disclosures made by CEO and CFO during the Form 10-K and 10-Q certification process about significant deficiencies, if any, in the design or operation of internal controls or any fraud that involves management or other employees who has a significant role in the Company's internal controls.
>
> Review[ing] earnings press releases (particularly use of "pro-forma," or "adjusted" non-GAAP information), as well as financial information and earnings guidance, if any, provided to analysts and rating agencies. … The Audit Committee Chairman and the independent auditors should each indicate their approval to management prior to the issuance of earnings press releases.
>
> Consider[ing] the effectiveness of the Company's internal control system, including information technology security and control and compliance with the reporting requirements of the Sarbanes Oxley Act [("SOX")].
>
> *        *        *
>
> …Verify[ing] that the CEO and CFO have certified that they disclosed to the independent auditors and to the Audit Committee all significant deficiencies, if any, in the design or operation of internal controls that could affect the Company's ability to record, process, summarize and report financial data, any material weaknesses in the internal controls, and fraud – whether or not material –

that involved management or other employees who have a significant role in the Company's internal control.

43.     The Individual Defendants are also subject to Resource Capital's Code of Business Conduct and Ethics (the "Ethics Code"), which requires that all employees "seek to avoid even the appearance of improper behavior," and mandates that all employees, including the Individual Defendants, comply with the "laws, rules and regulations of the cities and states in which [the Company] operates."  Moreover, the Ethics Code requires that:

> All employees must cooperate fully with the people responsible for preparing reports filed with the Securities and Exchange Commission and all other materials that are made available to the investing public to make sure the people responsible for preparing such reports and materials are aware in a timely manner of all information that might have to be disclosed in those reports or other materials or that might affect the way in which information is disclosed in them.

44.     Additionally, the Ethics Code emphasizes the importance of "Record-Keeping," stating in relevant part:

> Resource requires honest and accurate recording and reporting of information in order to make responsible business decisions.

*     *     *

> All of Resource's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect Resource's transactions and must conform both to applicable legal requirements and to Resource's system of internal controls.  Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation.

**SUBSTANTIVE ALLEGATIONS**

**A.     Company Background and The Puerto Rican Economy**

45.     According to its public filings, Resource Capital is a real estate finance company that is organized and conducts its operations to qualify as a real estate investment trust.  Its investment strategy focuses primarily on originating, holding and managing commercial

13

mortgage loans and other commercial real estate-related debt investments, however historically, the Company made other real estate and commercial finance investments.

46. Resource Capital is externally managed by Resource Capital Manager, Inc. ("Manager"), an indirect wholly-owned subsidiary of Resource America, Inc. (formerly traded on NASDAQ: REXI), or Resource America.

47. In 2007, certain of the Individual Defendants caused the Company to invest in the Mezzanine Loan, which at the time, was backed by a portfolio of 13 luxury hotel properties.

48. The Individual Defendants, albeit through the Company's filings, acknowledged the risks associated with investments in commercial real estate mezzanine loans. Indeed, as stated in the Company's public filings, "the ability of a borrower to repay a loan secured by or dependent upon an income-producing property typically depends primarily upon the successful operation of the property…. If the net operating income of the property is reduced, the borrower's ability to repay the loan may be impaired." In turn, the Individual Defendants knew that the "property location and condition; … changes in national, regional or local economic conditions and/or the conditions of specific industry segments in which [the Company's] lessees may operated; declines in regional or local real estate values; …[and] the availability of debt and equity financing" can affect the net operating income of the underlying properties and hence the performance of Resource Capital's mezzanine loan portfolio.

49. Notably, of the 13 luxury properties linked to the Mezzanine Loan, three were located in Puerto Rico—the El San Juan Hotel and Casino in Puerto Rico, the el Conquistador Golf Resort & Casino in Fajardo, and the Condado Plaza Hotel & Casino in San Juan. Accordingly, Puerto Rico's economy, even as early as 2006, was of material import to the Company.

14

50. Further, the portfolio of 13 luxury hotels backed $742.5 million of debt securitized through the 2007-WHALE8 Trust. As Puerto Rico's economy declined, the 2007-WHALE8 Trust also suffered. On August 20, 2012, Moody's downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations."

51. In or around September 2012, Blackstone, the owners of the hotels within the portfolio, was unable to meet its payment obligations to its specialty servicer. As a result, Blackstone entered into the Forbearance Agreement pursuant to which Blackstone would need to sell its hotels before March 24, 2014, and then refinance the remaining debt before maturity on September 9, 2014.

52. As properties were sold, the Mezzanine Loan became increasingly risky due to its over-concentration in Puerto Rico. Rather than acknowledge the impact on Resource Capital's mezzanine loan portfolio of Puerto Rico's economic decline, failing residential real estate market, under siege banking sector, elevated public debt, and faltering credit rating, the Individual Defendants elected to conceal the Company's exposure to the Puerto Rican economy.

53. By the spring of 2013, however, Puerto Rico's fiscal crisis was well-known and obvious eliciting reactions from the investing community. On August 26, 2013, for example, *Barron's* ran a cover story titled *Troubling Winds* that discussed Puerto Rico's failing economy and crisis-level debt. The article noted that at the time of the article, Puerto Rico carried "$53 billion of tax-supported debt outstanding from more than a dozen issuers, according to Moody's Investor Service, and nearly $70 billion of total debt, according to the Commonwealth." Moreover, Puerto Rico's debt burden was severely disproportionate to normative measures of the Commonwealth's financial health such as gross domestic product, person income, and population. Indeed, Puerto Rico carried a debt burden of $14,324 per capita, 10 times the

15

average of the 50 states and more than five times that of California, the state with the highest debt burden.  Accordingly, as of August 2013, Puerto Rico's general-obligation bonds received the lowest investment grade ratings available from both Moody's and Standards & Poor's, and both maintained "negative outlooks on Puerto Rico's credit rating, meaning there is a possibility that its debt could get downgraded to junk in the coming year."

54.     By February 2014, following further economic decline, all three major credit rating agencies downgraded Puerto Rico's debt to junk status.  As noted in a *MarketWatch* report dated February 12, 2014 titled *Puerto Rico bond turmoil sparks warning from muni fund*, from February 2013 to February 2014, the "Standard and Poor's Puerto Rico muni index dropped 21.3%, rare losses for the municipal bond market, which is often sought for its perceived safety."

55.     Puerto Rico's credit decline has since continued.  On January 4, 2016, Puerto Rico defaulted on $174 million of debt payments.  According to an article posted on *The New York Times*' DealBook Blog entitled *Puerto Rico Defaults on Debt Payments,* released that same day, Puerto Rico purportedly defaulted on the payment in order to pay its "general obligation bondholders, who are entitled to be paid first, according to the Puerto Rican constitution."

**B.     For Years Management Caused the Company to Conceal the Known Risks Associated with Resource Capital's "Mezzanine Loan"**

56.     Starting at least in 2012, the Individual Defendants caused the Company to host a series of analyst conference calls and file numerous quarterly and year-end financial reports with the SEC.  In each instance, the Individual Defendants caused the Company to assure the market that Resource Capital's real estate loans were performing well.

57.     On October 31, 2012, Resource Capital, at the direction of the Individual Defendants, hosted a conference call with analysts to discuss the Company's third quarter financial performance.  During the call, then-President, CEO and Director, Defendant J. Cohen,

16

represented that the Company's "portfolio of loans continued to perform well," and explained how "during 2012, [Resource Capital had] grown [its] real estate loan portfolio by over $150 million net, [with Management] expect[ing] this trend to continue as [it] continue[s] to find good opportunities to lend money against good real estate."  He continued:

> We have greatly strived to grow our origination channel in real estate and we believe that the investments we have made in our team and systems will start to pay off.  While our portfolio stayed constant for the quarter due to repayments from a legacy $28 million loan, legacy meaning made before the crisis, and another $6.5 million loan made in 2011, we underwrote and funded a series of, in my opinion, very attractive loans.  We are picking up pace and expect this portfolio to grow tremendously in the next few quarters, net of payoffs.  Dave Bloom will elaborate on this in the real estate portfolio momentarily.

58.    Then, during his discussion of the real estate portfolio, then-Senior Vice President of Real Estate Investments, Defendant Bloom stated:

> Credit across the portfolio continue[d] to trend in a positive direction with improving metrics across all asset classes.  The majority of the properties securing [Resource Capital's] loans [were] continuing to realize improved cash flow on a quarter-over-quarter basis.  ***And the entire portfolio remain[ed] ["]performing["] with no defaults [i.e., "current"].***

(Emphasis added).

59.    Nearly two weeks later, the Individual Defendants caused the Company to represent in its November 9, 2012 quarterly report for the period ended September 30, 2012, which was filed with the SEC on Form 10-Q (the "2012 10-Q"), that it maintained a risk grading system that "assign[ed] grades to commercial real estate loans" (the "Risk Grading System").  More specifically, the 2012 10-Q detailed:

> Loans are graded at inception and updates to assigned grades are made continually as new information is received.  Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating.  The Company designates loans that are sold after the period end at the lower of their fair market value or cast, net of any allowances and costs associated with the loan sales.  In addition to the ***underlying performance of the loan collateral***, the Company considers such things as the strength of the underlying

17

sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

| | Rating 1 | | Rating 2 | | Rating 3 | | Rating 4 | | Held for Sale | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **As of September 30, 2012:** | | | | | | | | | | | |
| Whole loans | $ | 415,782 | $ | 7,000 | $ | 98,874 | $ | — | $ | 34,000 | $ | 555,656 |
| B notes | | 16,357 | | — | | — | | — | | — | | 16,357 |
| Mezzanine loans | | 23,322 | | — | | 44,500 | | — | | — | | 67,822 |
| | $ | 455,461 | $ | 7,000 | $ | 143,374 | $ | — | $ | 34,000 | $ | 639,835 |
| | | | | | | | | | | | |
| **As of December 31, 2011:** | | | | | | | | | | | |
| Whole loans | $ | 329,085 | $ | 87,598 | $ | 90,225 | $ | 37,765 | $ | — | $ | 544,673 |
| B notes | | 16,435 | | — | | — | | — | | — | | 16,435 |
| Mezzanine loans | | 23,347 | | — | | 44,527 | | — | | — | | 67,874 |
| | $ | 368,867 | $ | 87,598 | $ | 134,752 | $ | 37,765 | $ | — | $ | 628,982 |

All of the Company's commercial real estate loans were performing as of September 30, 2012 and December 31, 2011.

*All of the Company's commercial real estate loans were performing as of September 30, 2012 and December 31, 2011.*

(Emphasis added).

60.  Critically, the $44.500 million in mezzanine loans represented by the Company (at the direction and under the control of the Individual Defendants) as "Rating 3" as of September 30, 2012 (which consisted of the Mezzanine Loan), was essentially unchanged from the $44.509 million represented by the Company as "Rating 3" as of June 30, 2012, $44.517 million represented by the Company as of March 31, 2012, and $44.527 million represented by the Company as of December 31, 2011, notwithstanding that payment history, collectability of interest, and loan terms were explicitly referenced as factors used to determine the credit rating of Resource Capital's loan portfolio.  By this time, Blackstone had already entered into the Forbearance Agreement and, as was later revealed, the Company had stopped receiving cash income from the Mezzanine Loan.

61.  Despite being aware of these facts, Defendants Bryant and J. Cohen certified the 2012 10-Q, signing it in accordance with the Sarbanes-Oxley Act of 2002 ("SOX"). Specifically, the certifications provided the following:

> 1.  I have reviewed this report on Form 10-Q for the quarter ended September 30, 2012 of Resource Capital, Corp.:

18

2. *Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*

3. Based on my knowledge, this financial statements, and other financial information included in this report, fairly present in all material respect the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information, relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

       **a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

       **b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.**

(Emphasis added).

62.    On March 5, 2013, the Individual Defendants caused the Company to host a conference call with stock analysts to discuss Resource Capital's fourth quarter and full year 2012 financial performance.  During the call, Defendant J. Cohen stated the following:

> ***Our credit quality is stable and improving*** and other than the legacy loans we have sold in our syndicated bank loan facility, we feel like the credit environment for us is excellent.  We took a modest provision on real estate loans in fourth quarter of $400,000*.*  ***However, all 43 of our outstanding real estate loans are performing and we see a trend of improving property performance underlying these loans beginning in 2011 through the year-end 2012 and continuing into 2013***.  ***That is, our real estate loss in shrinking.***
>
>              \*       \*       \*
>
> Our liquidity remains excellent.  We had approximately $180 million of cash including $94 million of unrestricted cash as of December 31, even when making considerable investment during the quarter.  Stay tuned for more investments.  ***Our portfolio of real estate loans continued to perform well***.  During 2012, we have grown our real estate loan portfolio by over $175 million.  ***We expect this trend to continue to find out good opportunities from that money against good real estate***.  We have generally strived to grow our origination channel and we believe that the investments we have made in our team and system, will start to pay off or have started to pay off and will continue to start to pay off.

(Emphasis added).

63.    Then, on March 18, 2013, the Individual Defendants caused Resource Capital to file its annual report on Form 10-K for the fiscal year ended December 31, 2012 (the "2012 10-K").  Defendants Kessler, J. Cohen, Beach, E. Cohen, Hart, Ickowicz, Levin, Neff and Bryant each signed the 2012 10-K on behalf of themselves and the Company.  Notably, the 2012 10-K

20

included the chart below, purporting to represent the geographic distribution of Resource Capital's commercial real estate loan portfolio:



Noticeably, any information related to the known exposure on the part of the Company to the Puerto Rican economy, particularly as it related to the Mezzanine Loan, was inexplicably omitted, thus concealed from the market.

64.    While admitting that certain geographic concentrations could affect the performance of the Company's investments, the 2012 10-K provided the following risk disclosure section ("Risk Disclosure"), which inexplicably failed to acknowledge the Company's known, yet undisclosed, exposure to the Puerto Rican economic crisis:

> ***Our investment portfolio <u>may</u> have material geographic, sector, property-type and sponsor concentrations***.
>
> We ***may*** have material geographic concentrations related to our direct or indirect investments in real estate loans and properties.  We also ***may*** have material concentrations in the property types and industry sectors that are in our loan portfolio.  ***Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios.***  An

21

adverse development in that area of concentration could reduce the value of our investment and our return on that investment and if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

(Emphasis added).

65.    Additionally, the 2012 10-K repeated the Company's previously described Risk Grading System, and incredibly, maintained the rating for its mezzanine loan portfolio, stating in relevant part:

We use a risk grading matrix to assign grades to commercial real estate loans. ***Loans are graded at inception and updates to assigned grades are made continually as new information is received***. Loans are graded on a scale of 1-4 with 1 representing our highest rating and 4 representing our lowest rating. We designate loans that are sold after the period end at the lower of our fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to ***the underlying performance of the loan collateral***, we consider such things as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading our commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of December 31, 2012:** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |
| | | | | | | |
| **As of December 31, 2011:** | | | | | | |
| Whole loans | $ 329,085 | $ 87,598 | $ 90,225 | $ 37,765 | $ — | $ 544,673 |
| B notes | 16,435 | — | — | — | — | 16,435 |
| Mezzanine loans | 23,347 | — | 44,527 | — | — | 67,874 |
| | $ 368,867 | $ 87,598 | $ 134,752 | $ 37,765 | $ — | $ 628,982 |

All of our commercial real estate loans were performing as of December 31, 2012 and 2011.

***All of our commercial real estate loans were performing as of December 31, 2012 and 2011***.

(Emphasis added).

66.    Remarkably, the $44.490 million in mezzanine loans assigned a "Rating 3" as of December 31, 2012 was essentially unchanged from the $44.500 million assigned a "Rating 3" as of September 30, 2012. Curiously, as would later prove to be misleadingly, the Individual Defendants caused Resource Capital to maintain its prior rating on the Mezzanine Loan despite

22

the Forbearance Agreement and the fact that the Company had stopped receiving income from the loan in September 2012 as interest merely accrued.  Seemingly, the Individual Defendants turned a blind eye on payment history, collectability of interest, and loan terms despite causing the Company to identify them as factors used to determine the credit rating of Resource Capital's loan portfolio.  Equally problematic, the 2012 10-K assured the market that all of Resource Capital's "commercial real estate loans were performing as of December 31, 2012[,]" when, in fact, that was not the case as was later revealed.

67.     Approximately two months later, on May 8, 2013, Resource Capital, under the control and at the direction of the Individual Defendants, hosted another conference call with stock analysts, this time to discuss the Company's first quarter 2013 financial performance. During the call, Defendant J. Cohen confirmed:

> Our portfolio of real estate loans continue to perform well.  During the last 12 months we have grown our real estate loan portfolio by over $223 million on a gross origination basis.  We expect this trend to continue as our real estate debt team continues to find good opportunities to lend money against good real estate. We have greatly strived to grow our origination channel and we believe the investments we have made in our team and systems will start to pay off.

68.     Defendant Bloom added:

> We note improving metrics across all asset classes with the majority of the properties securing our loans realizing improved cash flow year-over-year and continuing to trend in an upward direction.  In addition we are pleased to see that the majority of the asset-specific business plans across the portfolio are well on track and progressing towards the realization of borrower's plans for value creation and *the entire portfolio remains performing with no defaults*.

(Emphasis added).

69.     Two days later, on May 10, 2013, the Individual Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC for the quarter ended March 31,

2013 (the "May 2013 10-Q").  Defendants J. Cohen and Bryant both signed the May 2013 10-Q in accordance with SOX, thus making the same certifications identified in ¶61 above.

70.     Once again, the Individual Defendants caused the Company to conceal the then-known issues underlying the Mezzanine Loan, choosing instead to incorporate by reference the 2012 10-K Risk Disclosure, which inexplicably left out any reference to increased risk, much less any risk at all, related to the Puerto Rican economy.

71.     Similarly, the May 2013 10-Q included the same, if not substantially similar, statements regarding Resource Capital's Risk Grading System as identified in ¶59 above.  Again, the Company, at the direction and under the control of the Individual Defendants, labeled the Mezzanine Loan, now valued at $38,072 million, a "Rating 3" and assured the market that "all of the Company's commercial real estate were performing as of March 31, 2013 and December 31, 2012."

| | Rating 1 | | Rating 2 | | Rating 3 | | Rating 4 | | Held for Sale | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **As of March 31, 2013** | | | | | | | | | | | |
| Whole loans | $ | 497,052 | $ | — | $ | 53,362 | $ | — | $ | — | $ | 550,414 |
| B notes | | 16,293 | | — | | — | | — | | — | | 16,293 |
| Mezzanine loans | | 44,704 | | — | | 38,072 | | — | | — | | 82,776 |
| | $ | 558,049 | $ | — | $ | 91,434 | $ | — | $ | — | $ | 649,483 |
| | | | | | | | | | | | |
| **As of December 31, 2012** | | | | | | | | | | | |
| Whole loans | $ | 427,456 | $ | — | $ | 106,482 | $ | — | $ | 34,000 | $ | 567,938 |
| B notes | | 16,327 | | — | | — | | — | | — | | 16,327 |
| Mezzanine loans | | 38,296 | | — | | 44,490 | | — | | — | | 82,786 |
| | $ | 482,079 | $ | — | $ | 150,972 | $ | — | $ | 34,000 | $ | 667,051 |

All of the Company's commercial real estate loans were performing as of March 31, 2013 and December 31, 2012.

72.     As was also previously the case, the Individual Defendants caused Resource Capital to maintain its prior rating on the loan despite knowing of the Forbearance Agreement and the fact that the Company had stopped receiving cash income from the loan in September 2012 as interest merely accrued.  In addition, it was not the case that Resource Capital's "commercial real estate loans were performing as of March 31, 2013 and December 31, 2012." Rather, by this time, Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations" and Blackstone had already entered into the

Forbearance Agreement with its servicer because it was unable to meet its payment obligations, which resulted in Resource Capital not receiving cash income from the loan.

73.     Much remained the same in August 2013.  On August 7, 2013, the Individual Defendants caused Resource Capital to host a conference call with stock analysts to discuss the Company's second quarter 2013 financial performance.  Once again, Defendant Bloom touted the Company's loan portfolio, stating in relevant part, "credit across the portfolio continues to trend in a positive direction with improving metrics across all asset classes.  The majority of the properties securing our loans are continuing to realize improved cash flow and we are seeing borrowers' plans for value creation on or ahead of budget.  Once again, I am pleased to report that *the entire portfolio is performing* with no defaults."  (Emphasis added).

74.     Defendant Bryant emphasized that the Company's real estate loans were current and performing, stating in relevant part, "overall real estate credit has been excellent and to reiterate Jonathan's point, I characterize our bank loan portfolio credit as improving.  Five bank loans totaling $12.6 million are delinquent out of a total portfolio of $1.1 billion and remarkably, *all of our 49 real estate loans are current and performing*."  (Emphasis added).

75.     Two days later, in the Company's August 9, 2013 quarterly report filed on the same day with the SEC for the quarter ended June 30, 2013 (the "August 2013 10-Q"), the Individual Defendants caused the Company to include the Risk Disclosure and the same description of the Risk Grading System previously identified.  In addition, the August 2013 10-Q provided the following updated risk profile rating table:

25

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of June 30, 2013** | | | | | | |
| Whole loans | $  553,333 | $  — | $  55,374 | $  — | $  — | $  608,707 |
| B notes | 16,265 | — | — | — | — | 16,265 |
| Mezzanine loans | 28,938 | — | 38,072 | — | — | 67,010 |
| | $  598,536 | $  — | $  93,446 | $  — | $  — | $  691,982 |
| | | | | | | |
| **As of December 31, 2012** | | | | | | |
| Whole loans | $  427,456 | $  — | $  106,482 | $  — | $  34,000 | $  567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $  482,079 | $  — | $  150,972 | $  — | $  34,000 | $  667,051 |

All of the Company's commercial real estate loans were performing as of June 30, 2013 and December 31, 2012.

76.    Remarkably, the $38.072 million in mezzanine loans categorized as "Rating 3" as of June 30, 2013 maintained its prior rating despite the known-truths about the risks associated with the Mezzanine Loan related to the Puerto Rican economy, Blackstone's Forbearance Agreement and the fact that the Company stopped receiving cash income from the loan in September 2012. Furthermore, despite the representation otherwise, all of the Company's commercial real estate loans were *not* performing as of June 30, 2013 and December 31, 2012.

77.    The Individual Defendants also caused the Company to misrepresent its mezzanine loan portfolio as not containing any troubled-debt restructuring as of June 30, 2013, despite having accounted for the same in its previous filings. The August 2013 10-Q included the following table, which, when compared to previous filings, gave investors the impression that the quality of Resource Capital's mezzanine loan portfolio improved compared to the previous quarter, which disclosed a single TDR of $38.072 million. Ultimately it was revealed that this was not the case.

78.    On November 6, 2013, Defendants Bloom and Bryant, on behalf of the Company and with the other Individual Defendants' consent, continued to report strong results across all asset classes during the Company's conference call with stock analysts to discuss Resource Capital's third quarter 2013 financial performance. During the call, Defendant Bloom offered the following:

26

We are improving metrics across all asset classes with the majority of the property securing our loans realizing improved cash flow on a year-over-year basis and continuing to trend in upward direction. ***In addition, we are pleased to see that the majority of the asset specific plans across the portfolio are well on track and progressing toward realization ultimately of the borrowers' plans for value creation and the entire portfolio remains performing with no defaults***. We are very particular about markets in which we lend, sponsor quality and asset-specific business plans and the resilience of the assets I just described is a daily reminder that validates our keen focus on credit first approach to our business.

(Emphasis added).  Defendant Bryant further stated:

Overall, real estate credit has been excellent and I characterize the bank loan portfolio credit as very benign.  Three bank loans totaling $3.6 million are delinquent out of a portfolio of approximately $940 million and remarkably, ***all of our real estate loans are current and performing***.

(Emphasis added).

79.    Days later, on November 12, 2013, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2013 (the "November 2013 10-Q").  Once again, the November 2013 10-Q was certified in accordance with SOX by Defendants J. Cohen and Bryant.  In addition to including the same, if not substantially similar, Risk Disclosure as had been included in previous filings, the Individual Defendants provided the following updated table, which identified the ratings of its various credit risk profiles for commercial real estate loans:

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of September 30, 2013** | | | | | | |
| Whole loans | $ 591,105 | $ 44,943 | $ 32,067 | $ — | $ — | $ 668,115 |
| B notes | 16,238 | — | — | — | — | 16,238 |
| Mezzanine loans | 57,574 | — | — | — | — | 57,574 |
| | $ 664,917 | $ 44,943 | $ 32,067 | $ — | $ — | $ 741,927 |
| | | | | | | |
| **As of December 31, 2012** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |

All of the Company's commercial real estate loans were performing as of September 30, 2013 and December 31, 2012.

27

80.    Incredibly, despite knowing that the Mezzanine Loan was backed by the Puerto Rican assets, which were exposed to, and had been negatively impacted by, the Puerto Rican economy, among other things, the Individual Defendants caused the Company to place its entire mezzanine loan portfolio under its best credit risk category, "Rating 1."    This overt mischaracterization flew in the face of what was well known by the Individual Defendants at this time, including that: (i) Moody's had already downgraded the 2007-WHALE8 Trust "due to loan performance not meeting Moody's expectations[;]" (ii) Blackstone had already entered into the Forbearance Agreement with its servicer because it was unable to meet its payment obligations; and (iii) Resource Capital had long not been receiving cash income from the loan.  What's more, the Individual Defendants caused the Company to again claim that "***all of the Company's commercial real estate loans were performing as of September 30, 2013 and December 31, 2012***." (Emphasis added).

81.    Moreover, the November 2013 10-Q misrepresented Resource Capital's mezzanine loan portfolio, suggesting it did not contain any troubled-debt restructurings as of September 30, 2013:

28

*Troubled- Debt Restructurings*

The following tables show troubled-debt restructurings in the Company's loan portfolio (in thousands):

🔗 Link   ↻ Similar Tables   ⬇ Download

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Three Months Ended September 30, 2013:** | | | |
| Whole loans | 2 | $ 48,374 | $ 52,716 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | 2 | $ 48,374 | $ 52,716 |
| **Three Months Ended September 30, 2012:** | | | |
| Whole loans | 2 | $ 42,550 | $ 42,550 |
| B notes | — | — | — |
| Mezzanine loans | 1 | 38,072 | 38,072 |
| Bank loans | — | — | — |
| Loans receivable | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | 3 | $ 80,622 | $ 80,622 |

🔗 Link   ↻ Similar Tables   ⬇ Download

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Nine Months Ended September 30, 2013:** | | | |
| Whole loans | 4 | $ 104,702 | $ 109,044 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Loans receivable - related party | 1 | 6,592 | 6,592 |
| Total loans | 5 | $ 111,294 | $ 115,636 |
| **Nine Months Ended September 30, 2012:** | | | |
| Whole loans | 5 | $ 168,708 | $ 151,422 |
| B notes | — | — | — |
| Mezzanine loans | 1 | 38,072 | 38,072 |
| Bank loans | — | — | — |
| Loans receivable | — | — | — |
| Loans receivable - related party | 1 | 7,797 | 7,797 |
| Total loans | 7 | $ 214,577 | $ 197,291 |

As of September 30, 2013 and December 31, 2012, there were no troubled-debt restructurings that subsequently defaulted.

In reporting no troubled-debt restructurings within the Company's mezzanine loan portfolio as of September 30, 2012, the Individual Defendants caused the Company to represent to the investing public that its mezzanine loan portfolio improved compared to the previous year, when it disclosed a single TDR of $38.072 million.

82.    The Individual Defendants continued to cause the Company to conceal the truth about its mezzanine loan portfolio, including obscuring the truth about the Mezzanine Loan, throughout the first half of 2014. On February 26, 2014, during the Company's conference call with stock analysts to discuss its fourth quarter and full year 2013 financial performance, for example, Defendant Bryant confirmed the Mezzanine Loan was performing, stating in relevant part:

> We added 700,000 to our real estate loan reserve primarily for our previously impaired loan. Overall, real estate credit has been excellent and I characterized our bank loan portfolio as very benign. Three bank loans totaling $3.6 million are

delinquent out of a portfolio of $580 million and ***all 57 of our real estate loans are current and performing***.

(Emphasis added).

83.    Then, in the Company's annual report on Form 10-K filed with the SEC on March 3, 2014, for the period ended December 31, 2014 (the "2013 10-K"), which was signed by Defendants Kessler, J. Cohen, Beach, E. Cohen, Fore, Hart, Ickowicz, Levin, Neff, Wiggins, and Bryant, the Individual Defendants caused the Company to publish the following chart representing the geographic distribution of Resource Capital's commercial real estate loan portfolio, which noticeably omitted, thus concealed, any exposure on the part of the Company to Puerto Rico:



84.    Moreover, the Individual Defendants caused the Company to hide any exposure to the Puerto Rican economy in the 2013 10-K's Management Discussion and Analysis section, which represented that Resource Capital's real estate-related assets were solely located in the

United States and that all necessary provisions for loan loss and impairments had been made by the Company:

> *Although economic conditions in the United States have improved, previous conditions in real estate and credit markets continue to affect both us and a number of our commercial real estate borrowers.* Over a period of several years, we entered into loan modifications with respect to 17 of our outstanding commercial real estate loans. During the past three years, we have added to our provision for loan losses to reflect the effect of these conditions on our borrowers and have recorded both temporary and other than temporary impairments in the market valuation of CMBS and ABS in our investment portfolio. However, during 2012 and into December 31, 2013, *the improved economic conditions led to a stabilization in the credit quality of our portfolio and, as a result, our provision for loan losses has decreased significantly for 2013,* We expensed provisions of $3.0 million for the year ended December 31, 2013 as compared to provisions of $16.8 million for the year ended December 31, 2012. Our asset impairments have increased slightly, we recognized asset impairments of $863,000 for the year ended December 21, 2013 as compared to $180,000 for the year ended December 31, 2012.

(Emphasis added).

85.    Similarly, the 2013 10-K misrepresented the risk level of Resource Capital's commercial real estate loans portfolio, specifically its mezzanine loan portfolio, which included the Mezzanine Loan affected by the Puerto Rican economy. Not only did the 2013 10-K report that "All of [Resource Capital's] commercial real estate loans were performing as of December 31, 2013 and 2012[,]" but the Individual Defendants caused the Company to place over 75% of the Company's mezzanine loans under its best credit risk category, Rating 1:

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of December 31, 2013:** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |
| | | | | | | |
| **As of December 31, 2012:** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |

All of our commercial real estate loans were performing as of December 31, 2013 and 2012.

86.    Furthermore, as shown by the table below, the 2013 10-K also suggested that the Company's mezzanine loan portfolio contained no troubled-debt restructurings as of December 31, 2013, which, as was later revealed, was not accurate:

_Troubled-Debt Restructurings_

The following tables show troubled-debt restructurings in our loan portfolio (in thousands):

|  | Number of Loans | Pre-Modification Outstanding Recorded Balance | | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|---|
| **Year Ended December 31, 2013:** | | | | |
| Whole loans | 5 | $ | 143,484 | $ 147,826 |
| B notes | — | | — | — |
| Mezzanine loans | — | | — | — |
| Bank loans | — | | — | — |
| Residential mortgage loans | — | | — | — |
| Loans receivable - related party | 1 | | 6,592 | 6,592 |
| Total loans | 6 | $ | 150,076 | $ 154,418 |
| **Year Ended December 31, 2012:** | | | | |
| Whole loans | 6 | $ | 143,261 | $ 126,946 |
| B notes | — | | — | — |
| Mezzanine loans | 1 | | 38,072 | 38,072 |
| Bank loans | — | | — | — |
| Loans receivable - related party | 1 | | 7,797 | 7,797 |
| Total loans | 8 | $ | 189,130 | $ 172,815 |

As of December 31, 2013 and 2012, there were no troubled-debt restructurings that subsequently defaulted.

87.    Defendants J. Cohen and Bloom furthered the Individual Defendants' misleading story during the Company's May 7, 2014 earnings calls when they discussed the Company's first quarter 2014 financial performance with stock analysts.    Defendant J. Cohen stated the following:

> Our credit quality continues to be very solid, our real estate watch-list is shrinking and we reverse $4.6 million of the specific allowance in the first quarter as a result of the pending sale by the borrower on the property of a legacy the whole loan that will pay down the existing balance and further reduce our legacy loan portfolio.

Defendant Bloom added:

> Credit across the portfolio continues to trend in very positive direction, with improving metrics across all assets classes.    The majority of the properties securing our loans are continuing to realize improved cash flow and receiving borrower's plans for value creation well on or ahead of track.    Once again, I'm pleased to report that *the entire commercial real estate loan portfolio is performing with no defaults*.

(Emphasis added).

32

88.     Supporting these statements was the Company's quarterly report on Form 10-Q filed with the SEC on May 9, 2014 for the quarter ended March 31, 2014 (the "May 2014 10-Q"), which again placed over 75% the Company's mezzanine loan portfolio in the best rating category, Rating 1:

| | Rating 1 | | Rating 2 | | Rating 3 | | Rating 4 | | Held for Sale | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **As of March 31 2014** | | | | | | | | | | | |
| Whole loans | $ | 768,243 | $ | 32,500 | $ | 33,110 | $ | — | $ | — | $ | 833,853 |
| B notes | | 16,168 | | — | | — | | — | | — | | 16,168 |
| Mezzanine loans | | 51,832 | | 12,467 | | — | | — | | — | | 64,299 |
| | $ | 836,243 | $ | 44,967 | $ | 33,110 | $ | — | $ | — | $ | 914,320 |
| | | | | | | | | | | | |
| **As of December 31, 2013** | | | | | | | | | | | |
| Whole loans | $ | 680,718 | $ | 32,500 | $ | 32,571 | $ | — | $ | — | $ | 745,789 |
| B notes | | 16,205 | | — | | — | | — | | — | | 16,205 |
| Mezzanine loans | | 51,862 | | 12,455 | | — | | — | | — | | 64,317 |
| | $ | 748,785 | $ | 44,955 | $ | 32,571 | $ | — | $ | — | $ | 826,311 |

All of the Company's commercial real estate loans were performing as of March 31, 2014 and December 31, 2013.

89.     Furthermore, the May 2014 10-Q, again, represented that *"all of the Company's commercial real estate loans were performing as* of *March 31, 2014 and December 31, 2013*[,]" despite the Individual Defendants' knowing that Moody's had downgraded the 2007-WHALE8 Trust, Blackstone entered into the Forbearance Agreement, and Fitch Ratings had just recently (as of May 1, 2014) downgraded the 2007-WHALE8 trust due to "[p]erformance overall" being "significantly below issuance expectations."

90.     With the start of the second half of the year, the Individual Defendants continued to cause the Company to report its mezzanine loan portfolio in such ways as to hide the truth about the Mezzanine Loan, starting first with the Company's August 6, 2014 earnings call with stock analysts where the Company's second quarter 2014 financial performance was discussed. During this call, Defendant Bloom noted how the Company has seen, "improving credit metrics across all asset classes represented in [its] commercial real estate portfolio." He continued:

> The majority of the properties securing our loans are continuing to realize improved cash flow with borrowers plans for value creation well on track. I'm once, again, pleased to report that *the entire commercial real estate loan portfolio is performing with no defaults*.

(Emphasis added).

91.    Defendant Bryant then noted the following during the same call, "Only one bank loan for $1.6 million is delinquent out of a portfolio of $765 million and again *all of our real estate loans* totaling $1,000,043,000 *are current*." (Emphasis added).

92.    Two days later, on August 8, 2014, the Individual Defendants caused the Company to file with the SEC on Form 10-Q its quarterly report for the period ended June 30, 2014 (the "August 2014 10-Q").  Therein, the Company repeated the Risk Disclosure statement, which still lacked any reference to the known-issues related to the Puerto Rican economy:

> *Our investment portfolio may have material geographic, sector, property-type and sponsor concentrations.*
>
> We may have material geographic concentrations related to our direct or indirect investments in real estate loans and properties.  We also may have material concentrations in the property types and industry sectors that are in our loan portfolio.  Where we have any kind of concentration risk in our investments, we may be affected by sector-specific economic or other problems that are not reflected in the national economy generally or in more diverse portfolios.  An adverse development in that area of concentration could reduce the value of our investment and our return on that investment and, if the concentration affects a material amount of our investments, impair our ability to execute our investment strategies successfully, reduce our earnings and reduce our ability to make distributions.

93.    In addition, the mezzanine loan portfolio, as per the table below, remained rated the highest credit risk rating given by the Company, despite the fact that the Individual Defendants' knew that the Mezzanine Loan was not performing even to the standards expected by the ratings agencies:

34

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of June 30, 2014** | | | | | | |
| Whole loans | $ 900,246 | $ 32,500 | $ 22,000 | $ — | $ — | $ 954,746 |
| B notes | 16,138 | — | — | — | — | 16,138 |
| Mezzanine loans | 45,460 | 21,800 | — | — | — | 67,260 |
| | $ 961,844 | $ 54,300 | $ 22,000 | $ — | $ — | $ 1,038,144 |
| | | | | | | |
| **As of December 31, 2013** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

All of the Company's commercial real estate loans were current as of June 30, 2014 and December 31, 2013.

94.    Moreover, contrary to what the August 2014 10-Q represented, all of the Company's commercial real estate loans were not current as of June 30, 2014 and December 31, 2013—a material fact ultimately disclosed by the Company.  Further, the August 2014 10-Q, through the following table, suggested, albeit falsely, that the Company had no troubled-debt restructuring during the three months ended June 30, 2014 and 2013 or during the six months ended June 30, 2014:

*Troubled-Debt Restructurings*

The Company had no troubled-debt restructurings during the three months ended June 30, 2014 and 2013 or during the six months ended June 30, 2014.

The following table shows troubled-debt restructurings in the Company's loan portfolio during the six months ended June 30, 2013 (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Six Months Ended June 30, 2013** | | | |
| Whole loans | 2 | $ 56,328 | $ 56,328 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Residential mortgage loans | — | — | — |
| Loans receivable - related party | 1 | 6,592 | 6,592 |
| Total loans | 3 | $ 62,920 | $ 62,920 |

As of June 30, 2014 and 2013, there were no troubled-debt restructurings that subsequently defaulted.

95.    As was the case previously, this was flat wrong.  The Individual Defendants knew, yet concealed, that, among other things, the mezzanine loan portfolio included the Mezzanine Loan which had not generated any interest income (other than on an accrual basis) since September 2012.  Eventually, they caused the Company to recognize a loan loss allowance for its Puerto Rican investment of over $40 million.

96.    The story remained consistent during the next quarter's reporting period.  On November 4, 2014, the Company hosted an earnings conference call where Defendant Bloom

35

expressed pleasure reporting that, "*the entire commercial real estate portfolio is performing with no defaults*" and where Defendant Bryant explained how only, "two bank loans for $2.3 million are delinquent out of a portfolio of $712 million, just 32 basis points, and *all of our 65 real estate loans totaling $1.1 billion are current*." (Emphasis added).

97.     Approximately a week later, Resource Capital, under the control of the Individual Defendants, filed its quarterly report with the SEC on Form 10-Q for the period ended September 30, 2014 (the "November 2014 10-Q"). Again, the November 2014 10-Q reported that the Individual Defendants determined that mezzanine loans involving the Puerto Rican assets qualified under the Company's best credit risk category, Rating 1:

| | | Rating 1 | | Rating 2 | | Rating 3 | | Rating 4 | | Held for Sale | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **As of September 30, 2014** | | | | | | | | | | | | |
| Whole loans | $ | 990,471 | $ | 32,500 | $ | — | $ | — | $ | — | $ | 1,022,971 |
| B notes | | 16,107 | | — | | — | | — | | — | | 16,107 |
| Mezzanine loans | | 45,447 | | 21,858 | | — | | — | | — | | 67,305 |
| | $ | 1,052,025 | $ | 54,358 | $ | — | $ | — | $ | — | $ | 1,106,383 |
| | | | | | | | | | | | | |
| **December 31, 2013** | | | | | | | | | | | | |
| Whole loans | $ | 680,718 | $ | 32,500 | $ | 32,571 | $ | — | $ | — | $ | 745,789 |
| B notes | | 16,205 | | — | | — | | — | | — | | 16,205 |
| Mezzanine loans | | 51,862 | | 12,455 | | — | | — | | — | | 64,317 |
| | $ | 748,785 | $ | 44,955 | $ | 32,571 | $ | — | $ | — | $ | 826,311 |

All of our commercial real estate loans were current as of September 30, 2014 and December 31, 2013.

98.     Then, the Company filed its 2014 annual report on Form 10-K with the SEC on March 2, 2015 (the "2014 10-K). Notably, Defendants Kessler, J. Cohen, Beach, E. Cohen, Fore, Hart, Ickowicz, Levin, Neff, and Wiggins each signed the filings. Inexplicably, these defendants permitted the Company to represent, yet again, that the Company's real estate-related assets were solely located in the United States, and that all necessary provisions for loan loss and impairments had been made by the Company. Indeed, the following chart representing the geographic distribution of Resource Capital's commercial real estate loan portfolio, which concealed any exposure on the part of the Company to Puerto Rico, was included in the 2014 10-K:



99.     The Management Discussion and Analysis section of the 2014 10-K effectively confirmed that the Company's real estate-related assets resided solely in the United States, representing in relevant part:

> Although economic conditions in the United States have improved, previous conditions in real estate and credit markets continue to affect both us and a number of our commercial real estate borrowers. Over a period of several years, we entered into loan modifications with respect to 14 of our remaining outstanding commercial real estate loans. During the past 21 months, we have adjusted our provision for loan losses to reflect the effect of these conditions on our borrowers as well as, where necessary, market-related temporary adjustments to the market valuation of both CMBS and ABS in our investment portfolio. However, during 2013 and continuing through December 31, 2014, *the improved economic conditions led to a stabilization in the credit quality of our portfolio and, as a result, our provision for loan losses has decreased significantly in 2014*. For the year ended December 31, 2014, we have a net recovery in the provision for loan losses of $1.8 million, primarily due to the successful refinancing of a commercial real estate loan position on which we had previously established a significant reserve for credit loss. Also, other comprehensive income saw an increase of $20.1 million at December 31, 2014. While we believe we have appropriately valued the assets in our investment portfolio at December 31, 2014, we cannot assure you that further impairments will not occur or that our assets will otherwise not be adversely affected by market conditions.

100. Yet again, the Individual Defendants, somehow and despite knowing the truth about the Company's mezzanine loan portfolio exposure related to the Puerto Rican assets, concluded that these same mezzanine loans involving Puerto Rican assets warranted the best credit risk category rating:

| | | Rating 1 | | Rating 2 | | Rating 3 | | Rating 4 | | Held for Sale | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **As of December 31, 2014:** | | | | | | | | | | | | |
| Whole loans | $ | 1,231,092 | $ | 32,500 | $ | — | $ | — | $ | — | $ | 1,263,592 |
| B notes | | 16,072 | | — | | — | | — | | — | | 16,072 |
| Mezzanine loans | | 45,432 | | 21,934 | | — | | — | | — | | 67,366 |
| | $ | 1,292,596 | $ | 54,434 | $ | — | $ | — | $ | — | $ | 1,347,030 |
| | | | | | | | | | | | | |
| **As of December 31, 2013:** | | | | | | | | | | | | |
| Whole loans | $ | 680,718 | $ | 32,500 | $ | 32,571 | $ | — | $ | — | $ | 745,789 |
| B notes | | 16,205 | | — | | — | | — | | — | | 16,205 |
| Mezzanine loans | | 51,862 | | 12,455 | | — | | — | | — | | 64,317 |
| | $ | 748,785 | $ | 44,955 | $ | 32,571 | $ | — | $ | — | $ | 826,311 |

All of our commercial real estate loans were performing as of December 31, 2014 and 2013.

101. On May 6, 2015, the Individual Defendants caused Resource Capital to hold another conference call with stock analysts to discuss the Company's first quarter 2015 financial performance. During the call, Defendant Bloom stated:

> *I am once again pleased to report that the entire commercial real estate loan portfolio is performing with no defaults*. The broader real estate recover has taken hold and we remain optimistic about fundamentals, but are cautiously on the lookout for markets that we feel are outpacing normal sustainable growth. The positive performance of our portfolio is a daily reminder that validates the credit first approach to lending and selectivity we apply to markets, asset classes and sponsors in our origination process.

(Emphasis added). Defendant Bryant continued in relevant part:

> We ended the period with $4 million in commercial real estate allowances and $3.2 million in commercial financial allowances. With the loan exception of the one specific middle market position that began impaired our credit has been very good. One bank loan where a mere $251,000 is delinquent out of a portfolio of $298 million, all of our middle market loans are current and as Dave Bloom mentioned, *all 79 of our real estate loans totaling $1.5 billion are current*.

(Emphasis added).

102. The Company's May 11, 2015 Form 10-Q filed with the SEC for the quarter ended March 31, 2015 confirmed these statements, reprinting the same misleading Risk Disclosure statement as identified *infra*, and rating the Company's mezzanine loan portfolio in

the highest category while representing it contained no troubled-debt restructurings as of March 31, 2015, according to the tables that follow:

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of March 31, 2015** | | | | | | |
| Whole loans | $ 1,329,882 | $ 32,500 | $ — | $ — | $ — | $ 1,362,382 |
| B notes | 16,031 | — | — | — | — | 16,031 |
| Mezzanine loans | 45,417 | 22,054 | — | — | — | 67,471 |
| | $ 1,391,330 | $ 54,554 | $ — | $ — | $ — | $ 1,445,884 |
| | | | | | | |
| **As of December 31, 2014:** | | | | | | |
| Whole loans | $ 1,231,092 | $ 32,500 | $ — | $ — | $ — | $ 1,263,592 |
| B notes | 16,072 | — | — | — | — | 16,072 |
| Mezzanine loans | 45,432 | 21,934 | — | — | — | 67,366 |
| | $ 1,292,596 | $ 54,434 | $ — | $ — | $ — | $ 1,347,030 |

All of the Company's commercial real estate loans were current as of March 31, 2015 and December 31, 2014.

*Troubled-Debt Restructurings*

The following tables show troubled-debt restructurings in the Company's loan portfolio (in thousands):

⸜ Link      ⟳ Similar Tables      ⤓ Download

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Three Months Ended March 31, 2015:** | | | |
| Whole loans | 2 | $ 67,459 | $ 67,459 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Middle market loans | — | — | — |
| Residential mortgage loans | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | 2 | $ 67,459 | $ 67,459 |

The Company had no troubled-debt restructurings during the three months ended March 31, 2014. As of March 31, 2015 and 2014, there were no commercial real estate loan troubled-debt restructurings that subsequently defaulted.

**C.    By Mid-2015, the Individual Defendants Could No Longer Conceal the Whole Truth About the "Mezzanine Loan" and Its Impact on the Company**

103.    On August 4, 2015, the Individual Defendants caused the Company to issue a press release announcing its financial results for the quarter ended June 30, 2015. Therein, and for the first time, the Individual Defendants disclosed Resource Capital's exposure to the Puerto Rican economy, as well as the true credit risk profile of the Company's mezzanine loan portfolio. Specifically contributing to, if not the main cause of, the GAAP net loss of $31.0 million, which was recognized in the August 4, 2015 press release, was the Company's *recording of an allowance for loan loss on a mezzanine loan position of $41.1 million in total*. As was disclosed, "[t]he last three luxury brand hotel properties securing the loan are located in

or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rica resulted in events that caused the Company to determine that the loan should be fully reserved."

104. The next day, during the Company's second quarter 2015 earnings conference call, Defendant J. Cohen described the impact and origins of the Puerto Rican mezzanine loan, stating in relevant part:

> [A] legacy mezzanine loan that we purchased in 2007, one of the last two mezzanine positions in our portfolio deteriorated suddenly *due to its exposure to Puerto Rico and we were forced to impair that asset*. We stopped investing in this type of loan in 2007 and the remaining mezzanine loan in our portfolio is a very good credit, a $7 million position secured by property in New York City and we expect to pay off within the next 18 months. This impairment causes our book value to decrease to $4.56 leaving us trading at approximately 78% of GAAP book value.
>
> *      *      *
>
> Obviously, a large and very disappointing element of our result this quarter was the loan loss reserve that we recognize on our position in a mezzanine loan whose borrower is an affiliate of one of the world's largest private equity firms. The loan we impair was one where we had a small percentage of a subordinated mezzanine position in a complicated multi-tranche $2.8 billion transaction that financed luxury hotels.
>
> Our investment was purchased in 2007 had a very well capitalized and committed borrower went through several restructurings over the years to provide runway for the borrower to complete its business plan, and we do expect it to be paid off when that happened, *but the last three assets are in Puerto Rico. The borrower's ability to favorably refinance its senior loan was impacted by economic and credit conditions in Puerto Rico*, and the new loan, which closed in May, meaningfully reduced the borrower's time to achieve its plan. On such a highly-leveraged transaction, even small changes in value can have a large impact on the subordinated tranches, which unfortunately, is where we were. Accordingly, we are fully reserved for it.

(Emphasis added).

105. Later in the call, Defendant Bloom acknowledged that the Mezzanine Loan essentially provided no benefit to the Company *since September 2012*:

40

Jonathan addressed the specific reserve that we took this quarter on a mezzanine loan that was part of a very large multi-tranche financing that included a $1.3 billion first mortgage, $625 million of mezzanine debt split into eight tranches, many with multiple participants, and over $830 million of borrower at equity into the transaction. *It is important to note that this loan dates back to mid-2007 and was restructured and amended in 2012. And since that time, interest was on an accrual basis, so it is not contributed to our income since September of 2012 in any meaningful way*. Pursuant to the terms of the extension, the loan has not come due, nor is it in default. That said, in the ordinary course of closing our quarters, we review all of our loan positions and *after our review of the subject transaction, the determination was made to impair the position in the current quarter, as we have serious doubts about the ultimate collectability of loan upon maturity*. That said, markets can chance suddenly and with almost a year until the loan matures, no one can be absolutely certain about the ultimate resolution of this impaired loan.

By way of a brief history, RSO's commercial real estate business plan has always been to directly originate floating rate whole loans on likely transitional properties across the country. Having commenced operations in mid-2005, during the time that we were building out our national origination team, we still recognize relative value in certain mezzanine loan and B note investments. Markets were extremely liquid and the majority of these sub-debt positions paid off in relatively short order. That said, we were always cognizant of the fact that multi-tranche debt transactions involve other lenders which result in a lack of unilateral control should a problem arise.

(Emphasis added).

106. Then, on August 7, 2015, in the Company's quarterly report on Form 10-Q filed with the SEC for the quarter ended June 30, 2015 (the "August 2015 10-Q"), it was further revealed that:

The outstanding loan balance of $38.1 million was fully reserved and associated accrued interest of $3.0 million was reversed against interest income, for a total charge to operations of $41.1 million. The loan was originally supported by a portfolio of 13 hotel properties, most of which were luxury brand hotels. An impairment analysis showed that the fair value of the underlying collateral declined from that as of March 31, 2015. Contributing to this decline was a modification of the senior mortgage that accelerated the time horizon for disposing of the three remaining properties collateralizing the loan. *Compounding this fact, the remaining thee luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused*

41

*the Company to determine that realizable values had declined rapidly and that the troubled debt restructuring should be fully reserved as of June 30, 2015.*

(Emphasis added).

107.    Then, the Individual Defendants caused the Company to publish the following table, finally recognizing a substantial portion of its mezzanine loan portfolio in the Company's worst rated credit risk profile, Rating 4:

| | | Rating 1 | | Rating 2 | | Rating 3 | | Rating 4 | | Held for Sale | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **As of June 30, 2015** | | | | | | | | | | | | |
| Whole loans | $ | 1,467,901 | $ | 32,500 | $ | — | $ | 2,202 | $ | — | $ | 1,502,603 |
| B notes | | 15,997 | | — | | — | | — | | — | | 15,997 |
| Mezzanine loans | | 16,750 | | — | | — | | 38,072 | | — | | 54,822 |
| | $ | 1,500,648 | $ | 32,500 | $ | — | $ | 40,274 | $ | — | $ | 1,573,422 |
| | | | | | | | | | | | | |
| **As of December 31, 2014:** | | | | | | | | | | | | |
| Whole loans | $ | 1,231,092 | $ | 32,500 | $ | — | $ | — | $ | — | $ | 1,263,592 |
| B notes | | 16,072 | | — | | — | | — | | — | | 16,072 |
| Mezzanine loans | | 45,432 | | 21,934 | | — | | — | | — | | 67,366 |
| | $ | 1,292,596 | $ | 54,434 | $ | — | $ | — | $ | — | $ | 1,347,030 |

The Company had no delinquent commercial real estate loans as of June 30, 2015 and December 31, 2014.

108.    Notably, rather than representing that the Company's commercial real estate loans were "current" and "performing" as they did in each of Resource Capital's previous disclosures dating back to the beginning of the Relevant Period, the Individual Defendants modified the language used in connection with this disclosure, and instead caused the Company to state that it "had no delinquent commercial real estate loans."

109.    Moreover, the Management Discussion and Analysis section of the August 2015 10-Q changed from previous filings to reflect the impact that the Puerto Rican economy had on the Company's mezzanine loan portfolio.  In addition to changing the measure by which the Company reported performance of its commercial real estate loans (*i.e.,* "none of our 87 CRE loans, totaling $1.6 billion, are ***delinquent*** [rather than continuing to use the term "current"), this section provided, in relevant part:

Although economic conditions in the United States have improved, previous conditions in real estate and credit markets continues to affect both us and a number of our commercial real estate borrowers.  ***During the quarter ended June 30, 2015, the Company recorded a substantial allowance for loan loss on a***

42

*subordinated mezzanine loan position that was acquired in 2007. The outstanding loan balance of $38.1 million was fully reserved, and associated accrued interest of $3.0 million was reserved against interest income for a total charge of operation of $41.1 million. The loan was originally supported by a portfolio of 13 hotel properties, most of which were luxury brand hotels. The last three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that the loan is impaired.*

(Emphasis added).

110.   Incredibly, the Company disclosed its allowance for loan loss had increased to $46.319 million as of June 30, 2015, compared to $7.385 million as of March 31, 2015 and $4.613 million as of December 31, 2014.

### D.   The Company Faces a Sustained Securities Class Action While the Individual Defendants Continue to Mislead the Market

111.   As mentioned above, the Individual Defendants' misleading Relevant Period Disclosures subjected the Company to the sustained Securities Action currently pending in the Southern District of New York.  There, Judge Stanton, after considering a complaint alleging substantially similar misconduct as described herein, denied defendants' motion to dismiss. Specifically, he concluded that Resource Capital's describing of the Mezzanine Loan as "performing" or "current" without stating the qualification that it was a non-interest-paying troubled debt of a borrower in financial difficulty was "…to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances which they were made, not misleading…"

112.   All the while, the Individual Defendants continued to cause the Company to mislead the market.  On March 1, 2016, Defendant J. Cohen stated that because the Company's "core real estate lending business is doing quite well," and because Resource Capital's stock traded "well below book value," the Company was committed to a stock repurchase program.  In

addition, Defendant J. Cohen discussed the Company's "one-time" use of the core earnings per share ("EPS") metric (as opposed to AFFO), stating that "we wanted to be transparent to the marketplace [but] it is not our intent at this point to have that as the new metric that we use."

113. Defendant Bryant followed these statements with assurances that the only "drip and drab" impairments the Company faced "were all in the non-commercial real estate business" and that they "were isolated to small positions."

114. These sentiments were reinforced in May 2016 by Defendant Bloom who, when asked whether the Company had any concerns regarding its portfolio, replied that "we don't feel concerned about any of it."

115. On November 13, 2016, however, the tone changed. On that day, the Company recorded: (i) more than $20 million in "other-than-temporary impairments" on a commercial real estate CDO, and (ii) book value per share of $14.71, representing a decrease of almost $3 from Management's forecasted projection of $17.63. Notably, this was the same forecasted projection used to justify the aggressive share repurchase programs that resulted in the Company "returning" more than $37 million to shareholders.

116. Then, the Individual Defendants caused the Company to announce it would "simplify the Company" and "improve the transparency of [Resource Capital's] performance," admitting that its use of AFFO "*may not [have been] appropriate*." (Emphasis added).

117. Ultimately, the Individual Defendants revealed a new plan to institute the core EPS metric, which it claimed was necessary to "*improve transparency*" and "*more clearly demonstrate the dividend coverage.*" (Emphasis added). The Individual Defendants caused the Company to state that the dividend would be slashed from $0.42 per share to just $0.05 per share.

44

118.    These severe departures from the Company's forecasts and guidance came just three months after the Individual Defendants assured investors that "earnings from our core commercial real estate were strong," that the AFFO metric was still viable, that the Company was "dedicate[ed] to the $0.42 dividend" and "committed to repurchasing shares."

## DERIVATIVE AND DEMAND ALLEGATIONS

119.    Plaintiff brings this action derivatively in the right and for the benefit of Resource Capital to redress injuries suffered, and to be suffered, by Resource Capital as a direct result of the breaches of fiduciary duty by the Individual Defendants, which caused Resource Capital to disseminate false and misleading statements and omit material information to make such statements not false and misleading when made.  As a result of the Individual Defendants' omissions and their misconduct as detailed above, Resource Capital's credibility has been tarnished, Resource Capital's market capitalization has been substantially damaged, and Resource Capital's corporate image and goodwill has been irreparably harmed.  Resource Capital is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

120.    Plaintiff will adequately and fairly represent the interests of Resource Capital and its shareholders in enforcing and prosecuting its rights, and has retained counsel competent and experienced in shareholder derivative litigation.

121.    Plaintiff is and was an owner of Resource Capital stock during times relevant to Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

122.    In light of the foregoing events, on January 31, 2017, Plaintiff sent the Demand to Andrew L. Farkas ("Farkas"), the newly-appointed Chairman of the Company, requesting that

the Board investigate and take legal action against those responsible for the damages the Company has suffered and is certain to suffer.  See Exhibit A.

123.    Plaintiff's counsel received the Refusal dated March 22, 2017, acknowledging receipt of the Demand.  The refusal is notable because it was accompanied by a DEC Report purportedly addressing a shareholder demand that is "nearly identical to" Plaintiff's demand, and thus not Plaintiff's demand itself.  Regardless, it advised that "the Board voted unanimously to accept the recommendation of the DEC not to pursue the claims alleged."  See Exhibit B.

124.    In light of the foregoing, the Board's refusal to properly investigate and act on the Demand is improper, demonstrating the Board's lack of good faith, and confirming that Plaintiff should be allowed to proceed and to prosecute this action derivatively on behalf of the Company.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duties

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    As alleged in detail herein, each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Resource Capital shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

127.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages.  Thus, as a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

128.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Resource Capital.

130.    Plaintiff, as a shareholder and representative of Resource Capital, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Resource Capital and that Plaintiff is a proper and adequate representative of the Company;

B.    Against Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

C.    Directing Resource Capital to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable law and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

D.    Awarding to Resource Capital restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  April 25, 2017                           */s/ Joseph R. Seidman, Jr.*

**BERNSTEIN LIEBHARD LLP**
Joseph R. Seidman, Jr.
10 East 40th Street
New York, NY 10016
Tel:  (212) 779-1414
Fax:  (212) 779-3218

**THE WEISER LAW FIRM, P.C.**
ROBERT B. WEISER
BRETT D. STECKER
JAMES M. FICARO
JONATHAN M. ZIMMERMAN
22 Cassatt Avenue
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062

Counsel for Plaintiff